## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | |
|---|---|
| TOMMY DOMINO, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TMX FINANCE CORPORATE SERVICES, INC.,<br><br>Defendant. | Case No. \_\_\_\_CV423-080\_\_\_\_\_<br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Tommy Domino ("Plaintiff") brings this Class Action Complaint on behalf of himself, and all others similarly situated, against Defendant, TMX Finance Corporate Services, Inc. ("TMX" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to him, which are based on personal knowledge:

## NATURE OF THE ACTION

1.     Plaintiff brings this class action against TMX for its failure to properly secure and safeguard its customers' sensitive personally identifiable information, including, at the very least, full names, dates of birth, passport numbers, driver's license numbers, federal/state identification card numbers, tax identification numbers, Social Security numbers, financial account information, phone numbers, physical addresses, and email addresses (collectively, "PII"); and for failing to

1

comply with industry standards and common law and statutory duties to protect information systems that contain PII. Plaintiff seeks, among other things, damages, orders requiring TMX to fully and accurately disclose the nature of the information that has been compromised and to adopt reasonably sufficient security practices and safeguards to prevent incidents like this from reoccurring in the future, and for TMX to provide identity theft protective services to Plaintiff and Class members for their lifetimes, as Plaintiff and Class members will be at an increased risk of identity theft due to the conduct of TMX described herein.

2.      TMX is a financial services company that provides high-cost loans to consumers and "primarily specializes in auto loans."[1]

3.      In the course of applying for loans and other financial services offered by TMX, consumers must provide their sensitive personal information to Defendant. In turn TMX comes into the possession of, and maintains files containing, the PII of its customers.

---

[1] Menghan Xioa, *High-cost lender TMX Finance data breach affects nearly 5 million customers*, SC Media (Mar. 31, 2023), https://www.scmagazine.com/news/breach/high-cost-lender-tmx-finance-data-breach-affects-nearly-5-million-customers.

4.      As Defendant acknowledges in its Privacy Policy, TMX is obligated under federal law to implement adequate security measures in order to protect the PII it collects from consumers from unauthorized access and use.[2]

5.      Despite TMX's obligation to safeguard consumer PII from unauthorized access, on March 30, 2023, Defendant notified its consumers that their PII stored on its computer systems was exposed and/or exfiltrated by an unauthorized third-party (the "Data Breach").[3]

6.      Based on the public statements of Defendant to date, a wide variety of PII was implicated in the Data Breach, including, at the very least, full names, dates of birth, passport numbers, driver's license numbers, federal/state identification card numbers, tax identification numbers, Social Security numbers, financial account information, phone numbers, physical addresses, and email addresses.[4]

7.      As a direct and proximate result of Defendant's failure to implement and follow basic security procedures, Plaintiff's and Class members' PII is now in the hands of cybercriminals.

---

[2]  *See e.g.*, *TitleMax Privacy Policy*, TMX (Effective June 2020), https://www.tmxdisclosures.com/titlemax/privacy-policy.

[3]  *TMX Finance Corporate Services, Inc. Announces Data Breach Affecting 4.8 Million People*, JDSupra (Mar. 31, 2023), https://www.jdsupra.com/legalnews/tmx-finance-corporate-services-inc-6037074/.

[4]  *Id.*

8.    Plaintiff and Class members are now at a significantly increased and certainly impending risk of fraud, identity theft, and similar forms of criminal mischief, risk which may last for the rest of their lives. Consequently, Plaintiff and Class members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

9.    Plaintiff, on behalf of himself and all others similarly situated, allege claims for negligence, negligence *per se*, and declaratory judgment. Plaintiff seeks damages and injunctive relief, including the adoption of reasonably sufficient practices to safeguard PII in Defendant's custody in order to prevent incidents like the Data Breach from reoccurring in the future and for TMX to provide identity theft protective services to Plaintiff and Class members for their lifetimes.

## **PARTIES**

10.    Plaintiff Tommy Domino is an adult who, at all relevant times, is a resident and citizen of the state of Texas. Plaintiff received a Data Breach notification informing him that his PII provided to TMX had been compromised in the Data Breach.

11.    Since the announcement of the Data Breach, Plaintiff has been required to spend his valuable time monitoring his accounts in an effort to detect and prevent any misuses of his PII—time which he would not have had to expend but for the Data Breach.

4

12.    As a result of the Data Breach, Plaintiff will continue to be at heightened and certainly impending risk for fraud and identity theft, and their attendant damages for years to come.

13.    Defendant TMX is a Delaware corporation with a principal place of business located at 15 Bull Street, Suite 200, Savannah, Georgia, 31401. Defendant TMX is a subsidiary of TMX Finance LLC, a California limited liability company. Upon information and belief, TMX operates the brands "TilteMax," "TilteBucks," and "InstaLoan."

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

15.    This Court has personal jurisdiction over Defendant because Defendant resides in this District, at all relevant times it has engaged in substantial business activities in Georgia.

16.    Pursuant to 28 U.S.C. § 1391(b)(1) and (2), venue is proper in this District because this is where the Defendant resides and is where a substantial part of the events or omissions giving rise to the claims occurred.

## FACTUAL BACKGROUND

**A.    The Services TMX Provides.**

17.    TMX is a financial services company that operates the lending brands TilteMax, TilteBucks, and InstaLoan. TMX employs approximately 2,000 employees and generates over $1 billion in annual revenue.[5]

18.    TilteMax is a lending business with 900 locations across 14 states.[6] TitleMax provides loans to individuals who generally have limited access to consumer credit from banks, thrift institutions, credit card lenders, and other traditional sources of consumer credit.

19.    TitleBucks offers vehicle title-secured loans and/or pawns to consumers in need of cash online or in-store, with 60 locations across six states.[7]

20.    InstaLoan offers personal loan services to consumers with bad credit and operates approximately 25 locations across the state of Florida.[8]

21.    In the course of applying for loans and other financial services, consumers must entrust and provide their PII to TMX, which includes, *inter alia*, full names, dates of birth, passport numbers, driver's license numbers, federal/state

---

[5] JDSupra, *supra* note 4.

[6] *About TitleMax*, TitleMax, https://www.titlemax.com/about-us/, (last visited Apr. 4, 2023).

[7] *About Us*, TitleBucks, https://www.titlebucks.com/about-us/, (last visited Apr. 4, 2023).

[8] *About Us*, InstaLoan, https://www.instaloan.com/about-us/, (last visited Apr. 4, 2023).

identification card numbers, tax identification numbers, Social Security numbers, financial account information, phone numbers, physical addresses, and email addresses. In return, consumers reasonably expect that Defendant will safeguard their highly sensitive PII.

22.    However, despite TMX's promise "[t]o protect [consumers'] personal information from unauthorized access and use"[9] Defendant employed inadequate data security measures to protect and secure the PII consumers entrusted to it, resulting in the Data Breach and compromise of Plaintiff's and Class members' PII.

**B.    The Value of Private Information and Effects of Unauthorized Disclosure.**

23.    TMX was well aware that the PII it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

24.    TMX also knew that a breach of its computer systems, and exposure of the PII stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

25.    These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, and many others.

---

[9]    *TitleMax    Privacy    Policy*,    TMX    (Effective    June    2020), https://www.tmxdisclosures.com/titlemax/privacy-policy.

26.    PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[10]

27.    As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[11]

28.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[12]

29.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[13]

---

[10] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

[11] What to Know About Identity Theft, Fed. Trade Comm'n (Apr. 2021), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft.

[12] *Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/.

[13] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-

30.    The ramifications of TMX's failure to keep Plaintiff and Class members' PII secure are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches, "in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[14]

31.    Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

---

cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Apr. 4, 2023).

[14] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf (last visited Apr. 4, 2023).

32.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendant's consumers especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

33.    **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

34.    Indeed, even the Social Security Administration warns that the process of replacing a Social Security is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

10

> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[15]

35.     Social security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

36.     **Driver's License Numbers**—are highly sought after by cyber criminals on the dark web because they are unique to a specific individual and extremely sensitive.  This is because a Driver's License number is connected to an individual's vehicle registration, insurance policies, records on file with the DMV, places of employment, doctor's offices, government agencies, and other entities.

37.     For these reasons, Driver's License numbers are highly sought out by cyber criminals because they are one of the most valuable pieces of information to

---

[15] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

facilitate identity theft and fraud. This information is valuable because cyber criminals can use this information to open credit card accounts, obtain insurance policies and submit fraudulent claims, open cell phone contracts, file fraudulent tax returns, file unemployment applications, as well as obtain bank loans under a person's name.

38. Further, unlike credit or debit card numbers in a payment card data breach, which can quickly be frozen and reissued in the aftermath of a breach, the type of PII at stake here—unique Driver's License numbers—cannot be easily replaced.

39. **Financial Account Information**—Stolen financial account information can have an equally devasting impact on consumers. Cybercriminals can deplete and wipe out a person's life savings or take out a loan or mortgage against someone's home with the click of a button.

40. Based on the value of its consumers' PII to cybercriminals, TMX knew or should have known, the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its data security systems were breached. TMX failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**C.    Financial Institutions are Particularly Vulnerable to Data Breaches.**

41.    TMX has a responsibility to securely maintain the customer PII that it receives and keep it safe from harm. TMX knows that financial institutions such as itself are prime targets for data breaches.

42.    "The financial sector has always been considered to have a wide array of secure and protected systems in place due to its continuous dealing with private information and the handling of large sums of money."[16] "Due to the nature of these businesses and the sensitivity of their data, financial firms are hit with approximately 300 times more cyber attacks than businesses in other industries."[17]

43.    "In 2018 the sector reported 819 cyber incidents, a significant increased from the 69 incidents reported in 2017."[18]

44.    "Banks and financial services organizations were the targets of 25.7 percent of all malware attacks [in 2018], more than any other industry."[19]

---

[16] Sangfor Technologies, *Cyber-attacks on Banks Devastate the Financial Sector*, Sangfor (Nov. 7, 2022), https://www.sangfor.com/blog/cybersecurity/cyber-attacks-on-banks-devastate-financial-sector.

[17] Brian Thomas, *Financial Data Breaches 2019: Capital One, First American, Desjardins, More*, BitSight (Oct. 1, 2019), https://www.bitsight.com/blog/financial-data-breaches-2019-capital-one-first-american-desjardins-more.

[18] *Id.*

[19] Zak Doffman, *Cybercrime: 25% of All Malware Targets Financial Services, Credit Card Fraud Up 200%*, Forbes (Apr. 29, 2019), https://www.forbes.com/sites/zakdoffman/2019/04/29/new-cyber-report-25-of-all-malware-hits-financial-services-card-fraud-up-200/?sh=a15e9e17a47a.

45.    Particularly in the time since the outbreak of Covid-19, while more employees are working remotely than ever before, cybercriminals are working to exploit fear and uncertainty. From February to April 2020, cyber-attacks in the financial sector increased by 238 percent.[20]

46.    TMX knew, or should have known, the importance of safeguarding Plaintiff and Class members' PII entrusted to it, and knew, or should have known, the foreseeable consequences if that data was disclosed. This includes the significant costs that would be imposed on consumers as a result of a breach. TMX failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

**D.    TMX Breached its Duty to Protect Consumers' PII.**

47.    On March 30, 2023, TMX announced that it had suffered a Data Breach.

48.    According to Defendant, it detected suspicious activity on its computer systems on or about February 13, 2023.[21] After learning of the suspicious activity, TMX engaged cybersecurity experts and took steps to investigate.[22]

---

[20] Tom Kellerman, *Cybercriminals banking on finance: Mitigating escalation*, Help Net Security (June 17, 2020), https://www.helpnetsecurity.com/2020/06/17/cybercriminals-sophisticated/.
[21] *Notice of Data Breach*, TMX Finance (Mar. 30, 2023), https://www.documentcloud.org/documents/23735720-tmx-finance-sample-copy-of-individual-notice-l01.
[22] *Id.*

49.    Based on the investigation, TMX discovered that unknown third-party gained access to its computer systems in early December 2022.[23] Defendant further determined that an unauthorized third-party potentially exfiltrated confidential consumer information between February 3 and February 14, 2023.[24]

50.    Upon learning that the unauthorized third-party potentially exfiltrated confidential consumer information, TMX reviewed the impacted files and determined that the information exposed during the Data Breach includes, *inter alia*, full names, dates of birth, passport numbers, driver's license numbers, federal/state identification card numbers, tax identification numbers, Social Security numbers, financial account information, phone numbers, physical addresses, and email addresses.[25]

51.    On or about March 30, 2023, TMX notified its consumers whose information was impacted by the Data Breach, including Plaintiff.

52.    Like Plaintiff, Class members received similar notices informing them that their PII was accessed and/or exposed by the Data Breach.

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

53.    According to TMX's filing with the Maine Attorney General, approximately 4.8 million individuals were impacted by the Data Breach.[26]

54.    The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic security procedures in order to protect its consumers' PII.

**E.    FTC Guidelines Prohibit TMX from Engaging in Unfair or Deceptive Acts or Practices.**

55.    TMX is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

56.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[27]

---

[26] *Data Breach Notifications*, Office of the Main Attorney General (Mar. 30, 2023), https://apps.web.maine.gov/online/aeviewer/ME/40/179ab0ce-2c43-4119-ae5a-db766d4be3e0.shtml.

[27] *Start with Security – A Guide for Business*, United States Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

57.    The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[28]

58.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[29]

59.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[28] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personalinformationpdf.
[29] *Id.*

17

60.    TMX failed to properly implement basic data security practices. TMX's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumers' PII constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

61.    TMX was at all times fully aware of its obligations to protect the PII of consumers because of its position as a financial institution, which gave it direct access to reams of PII. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**F.    TMX Is Subject to, and Failed to Comply with, the GLBA.**

62.    The Gramm-Leach-Bliley Act ("GLBA"), states that "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

63.    A "financial institution" is defined as "any institution the business of which is engaging in financial activities as described in section 1843(k) of title 12." 15 U.S.C. § 6809(3)(A). TMX is considered a financial institution for purposes of the GLBA. *See* 12 U.S.C. § 1843(k)(4).

64.    "Nonpublic personal information" means "personally identifiable financial information provided by a consumer to a financial institution; resulting

from any transaction with the consumer or any service performed for the consumer; or otherwise obtained by the financial institution." 15 U.S.C. § 6809(4)(A)(i)-(iii). The PII involved in the Data Breach constitutes "nonpublic personal information" for purposes of the GLBA.

65.     TMX collects "nonpublic personal information", as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period TMX was subject to the requirements of the GLBA, 15 U.S.C. §§ 6801, *et seq.*, and is subject to numerous rules and regulations promulgated on the GLBA statutes.

66.     The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and

procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4. As alleged herein, TMX violated the Safeguard Rule.

67.    TMX failed to assess reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information.

68.    TMX's conduct resulted in a variety of failures to follow GLBA mandated rules and regulations, many of which are also industry standard. Among such deficient practices, the Data Breach demonstrates that TMX failed to implement (or inadequately implemented) information security policies or procedures such as effective employee training, adequate intrusion detection systems, regular reviews of audit logs and records, and other similar measures to protect the confidentiality of the PII it maintained in its data systems.

69.    Had TMX implemented data security protocols, the consequences of the data exposure could have been avoided, or at least significantly reduced as the exposure could have been detected earlier, the amount of PII compromised could have been greatly reduced, and affected consumers could have been notified—and taken protective/mitigating actions—much sooner.

**G.**    **Plaintiff and Class Members Suffered Damages.**

70.    The ramifications of TMX's failure to keep PII secure are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

71.    Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct. Further, the value of Plaintiff and Class members' PII has been diminished by its exposure in the Data Breach.

72.    Plaintiff and Class members are at substantial increased risk of suffering identity theft and fraud or misuse of their PII as a result of the Data Breach. From a recent study, 28% of consumers affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[30]

73.    Further, Plaintiff and Class members have incurred and will incur out of pocket costs for protective measures, such as identity theft protection, credit

---

[30] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KnowBe4, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last visited Apr. 4, 2023).

monitoring, credit report fees, credit freeze fees, and similar costs related to the Data Breach.

74.    Besides the monetary damage sustained in the event of identity theft, consumers may have to spend hours trying to resolve identity theft issues. For example, the FTC estimates that it takes consumers an average of 200 hours of work over approximately six months to recover from identity theft.[31]

75.    Plaintiff and Class members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its consumers' PII.

76.    Plaintiff and Class members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private information to strangers.

77.    As a result of TMX's failure to prevent the Data Breach, Plaintiff and Class members have suffered and will continue to suffer injuries, including out of pocket expenses; loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Breach; theft of their

---

[31] Kathryn Parkman, *How to Report identity Theft*, ConsumerAffairs (Feb. 17, 2022), https://www.consumeraffairs.com/finance/how-to-report-identity-theft.html.

valuable PII; the imminent and certainly impeding injury flowing from fraud and identity theft posed by their PII being disclosed to unauthorized recipients and cybercriminals; damages to and diminution in value of their PII; and continued risk to Plaintiff's and the Class members' PII, which remains in the possession of Defendant and which is subject to further breaches so long as TMX fails to undertake appropriate and adequate measures to protect the PII that was entrusted to it.

## CLASS ACTION ALLEGATIONS

78.    Plaintiff brings this class action on behalf of himself and all other individuals who are similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

79.    Plaintiff seeks to represent a class of persons to be defined as follows:

All individuals in the United States whose PII was compromised in the TMX Data Breach which was announced on or about March 30, 2023 (the "Class").

80.    Excluded from the Class are Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

81.    This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended

pleading or when he moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

82.    **Numerosity:** Plaintiff is informed and believes, and thereon alleges, that there are at minimum, millions of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes at a minimum 4.8 million individuals.

83.    **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

a.    Whether Defendant had a duty to protect the PII of Plaintiff and Class members;

b.    Whether Defendant was negligent in collecting and storing Plaintiff's and Class members' PII, and breached its duties thereby;

c.    Whether Plaintiff and Class members are entitled to damages as a result of Defendant's wrongful conduct; and

d.    Whether Plaintiff and Class members are entitled to restitution as a result of Defendant's wrongful conduct.

84. **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class are all current or former consumers of Defendant, each having their PII exposed and/or accessed by an unauthorized third party.

85. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class members are substantially identical as explained above.

86. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

87.    **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class members, then Plaintiff and each Class member suffered damages by that conduct.

88.    **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23 (b)(2).

89.    **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class members may be readily identified through Defendant's books and records.

## <u>COUNT I</u>
## NEGLIGENCE
### (Plaintiff on Behalf of the Class)

90.    Plaintiff restates and realleges the allegations contained in paragraphs 1-89 above as if fully set forth herein.

91.    Plaintiff brings this claim individually and on behalf of the Class.

92.     TMX owed a duty to Plaintiff and members of the Class to take reasonable care in managing and protecting the PII it collected from Plaintiff and the Class. This duty arises from multiple sources.

93.     TMX owed a common law duty to Plaintiff and the Class to implement reasonable data security measurers because it was foreseeable that unknown third parties would target Defendant's computer systems containing Plaintiff's and members of the Class's PII, and that should a breach occur, Plaintiff and Class members would be harmed. Defendant alone controlled its computer systems that were accessed during the Data Breach and allowed hackers to breach and exfiltrate consumers' PII stored therein. Defendant further knew or should have known that if unauthorized third parties gained access to its computer systems, they would extract sensitive PII and inflict injury upon Plaintiff and the Class. TMX knew of should have known that if unauthorized third parties gained access to consumers' PII, the responsibility for remediating and mitigating the consequences of the Data Breach would largely fall on individual persons whose data was compromised and/or exfiltrated. Therefore, the Data Breach and harm that it caused Plaintiff and the Class was the foreseeable consequence of TMX's inadequate data security measures.

94.     Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant.

27

By collecting and storing valuable PII that is routinely targeted by cyber-criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

95.    Additionally, Defendant was obligated under the FTC Act and the GLBA to take reasonable measures to protect Plaintiff's and Class members' PII. As such, Defendant's statutory duties are a further source of its duty to Plaintiff and the Class.

96.    Defendant's duty included, among other things: (a) designing, maintaining, and testing its security systems to ensure that Plaintiff's and Class members' PII in Defendant's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

97.    Defendant breached the duties owed to Plaintiff and Class members and thus was negligent. Defendant breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the PII of Plaintiff and Class members; (b) detect the Data Breach while it was ongoing; (c) maintain security systems consistent with industry standards; and (d) disclose that Plaintiff's and Class members' PII in

Defendant's possession had been or was reasonably believed to have been, stolen or compromised.

98.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class members, their PII would not have been compromised.

99.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class members have suffered injuries, including:

a.    Theft of their PII;

b.    Costs associated with requested credit freezes;

c.    Costs associated with the detection and prevention of identity theft and unauthorized use of the PII;

d.    Costs associated with purchasing credit monitoring and identity theft protection services;

e.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

f.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and

imposing withdrawal and purchase limits on compromised accounts;

g.    The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of cyber-criminals;

h.    Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class members data against theft and not allow access and misuse of their data by others; and

i.    Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff.

100.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT II
## NEGLIGENCE *PER SE*
### (Plaintiff on Behalf of the Class)

101.     Plaintiff restates and realleges the allegations contained in paragraphs 1-89 above as if fully set forth herein.

102.     Plaintiff brings this claim individually and on behalf of the Class.

103.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by institutions such as Defendant or failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

104.     Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of a data breach.

105.     Plaintiff and Class members are customers within the class of persons Section 5 of the FTC Act (and similar state statutes) was intended to protect.

106.     Moreover, the harm that has occurred is the type of harm that the FTC was intended to guard against.

107.     As a direct and proximate result of Defendant's negligence, Plaintiff and Class members have been injured as described herein and above, and are entitled

to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

108.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

109.    The GLBA states "that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

110.    TMX violated the GLBA and the Safeguards Rule by failing to use reasonable measures to protect PII and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and disclosed and the foreseeable consequences of a data breach.

111.    Plaintiffs and Class members are consumers within the class of persons the GLBA and the Safeguards Rule were intended to protect.

112.    Moreover, the harm that has occurred is the type of harm that the GLBA and the Safeguards Rule were intended to guard against.

113.    As a direct and proximate result of TMX's negligence, Plaintiffs and Class members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

114.    TMX's violation of GLBA and the Safeguards Rule constitutes negligence *per se*.

115.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**COUNT III**
**DECLARATORY JUDGEMENT**
**(Plaintiff on Behalf of the Class)**

116.    Plaintiff restates and realleges the allegations contained in paragraphs 1-89 above as if fully set forth herein.

117.    Plaintiff brings this claim individually and on behalf of the Class.

118.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

119.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class members' PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff's and Class members from further data breaches that compromise their PII. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff

continues to suffer injury as a result of the compromise of his PII and remains at imminent risk that further compromises of his PII will occur in the future.

120.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendant owes a legal duty to secure consumers' PII and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and the GLBA; and

b.    Defendant continues to breach this legal duty by failing to employ reasonable measures to consumers' PII.

121.    This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect consumers' PII.

122.    If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach with Defendant. The risk of another such breach is real, immediate, and substantial. If another breach with Defendant occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

123.    The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff will likely be subjected to

substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

124.    Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and Class members whose PII would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of himself and all other similarly situated, prays for relief as follows:

a.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

c.    For damages in an amount to be determined by the trier of fact;

d.    For an order of restitution and all other forms of equitable monetary relief;

e.    Declaratory and injunctive relief as described herein;

f.    Awarding Plaintiff's reasonable attorneys' fees, costs, and

expenses;

g.    Awarding pre- and post-judgment interest on any amounts

awarded; and,

h.    Awarding such other and further relief as may be just and proper.

## **JURY TRIAL DEMAND**

A jury trial is demanded on all claims so triable.

Dated: April 4, 2023                    Respectfully Submitted,

/s/Thomas A. Withers
Thomas A. Withers
Georgia Bar No: 772250
GILLEN, WITHERS & LAKE, LLC
8 East Liberty Street
Savannah, Ga. 31401
(912) 447-8400
TWithers@gwllawfirm.com

Gary F. Lynch (*pro hoc vice*
*forthcoming*)
Nicholas A. Colella
**LYNCH CARPENTER, LLP**
1133 Penn Ave., Fl. 5
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Facsimile: (412) 231-0246
gary@lcllp.com
nickc@lcllp.com

Daniel Srourian (*pro hoc vice forthcoming*)
**Srourian Law Firm, P.C.**
3435 Wilshire Blvd.
Suite 1710
Los Angeles, CA 90010
P: (213) 474-3800
F: (213) 471-4160
daniel@slfla.com

*Counsel for Plaintiff*